UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 26-22376-CV-MIDDLEBROOKS

ROBERT RIVERNIDER,

        Petitioner,

v.

ACTING WARDEN, KELVIN BROWN
FDC MIAMI,

        Respondent[1].

_____/

## RESPONDENT'S RESPONSE TO THE COURT'S SUPPLEMENTAL ORDER TO SHOW CAUSE REGARDING PETITIONER'S AMENDED PETITION PURSUANT TO 28 U.S.C. § 2241

Respondent, Kelvin Brown, the Acting Warden of FCI Miami, hereby files this Response to the Court's Supplemental Order to Show Cause.[2] In his Second Amended Petition[3], Petitioner Robert Rivernider ("Petitioner" or "Rivernider") alleges various grounds for relief: (1) his "incarcerat[ion] [is] based solely on alleged technical violations of supervised

---

[1] The Bureau of Prisons ("BOP") requests the Court substitute Kelvin Brown, who is presently the acting Warden for FDC Miami and the proper Respondent to Petitioner's petition. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).

[2] In denying Petitioner's latest Motion (DE 24), the Court asked the Respondent to show cause "why they have failed to comply with my Supplemental Order to Show Cause" (DE 25). However, the Respondent had requested, and this Court granted, an extension of time for Respondent to file its response on or before May 15, 2026. *See* (DE 23). Therefore, the Respondent has complied with this Court's orders and has responded prior to the extended deadline.

[3] "[A]n amended [petition] supersedes the initial [petition] and becomes the operative pleading in the case." *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1219 (11th Cir. 2007).

release involving no new criminal conduct;" (2) the "[i]mposition of" his "36-month term of imprisonment" for his supervised release violations was imposed "without a grand jury indictment in violation of the Fifth Amendment;" (3) his sentence was "imposed without a jury trial and without proof beyond a reasonable doubt;" (4) "[j]urisdiciton was transferred" to the Middle District of Florida from Connecticut "without disclosure of pre-existing alleged violations, rendering the transfer invalid and depriving the sentencing court of jurisdiction;" (5) the revocation proceedings "were based on inconsistent allegations, lack of notice, and absence of standard procedural protections" in violation of due process; (6) BOP "has failed to properly calculate sentence credits and prior custody;" (7) BOP "[f]ail[ed] to [a]pply First Step Act [c]redits;" (8) "BOP designation" "delay of approximately three and a half months" "prevented Petitioner from earning additional credits;" (9) "Petitioner is being held beyond the lawful duration of custody" due to "these errors;" and (10) "Petitioner is non-violent, near release, and eligible for home confinement." *See* (DE 6-2:1-2). For the reasons stated below, Petitioner's petition should be denied.

## I.      RELEVANT BACKGROUND

In February 2013, Rivernider, after initialing proceeding to trial, ultimately entered a guilty plea to all counts in his indictment, charging him with two counts of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and sixteen counts of wire fraud, in violation of 18 U.S.C. § 1343 (Exhibit "A") (Petition of Change of Plea). Rivernider's scheme involved defrauding innocent victims to the tune of over $20 million. As evidenced by his latest petition, Rivernider has a problem accepting responsibility for his actions:

> The record in this case clearly establishes that . . . Rivernider is a schemer who will lie and deceive others to advance his personal agenda. Regrettably, it appears he has not changed his stripes as he moves toward sentencing and tries to minimize his role and the scope of his conduct by playing fast and loose with

2

the facts of the case. Indeed, his memorandum almost totally ignores his substantial role in orchestrating the year-and-a-half real estate flipping scheme that resulted in over $20 million in losses, impacted at least 18 lenders, and destroyed the credit worthiness of as many as 62 buyers, leaving them with trying to support mortgages with payments they could not afford and ultimately holding deficiency judgments that they will undoubtedly never be able to repay. Instead, much of the focus of [Rivernider's] memorandum is not the widespread real estate fraud scheme he designed, but rather his ["]No More Bills["] Ponzi scheme that resulted in approximately $2.16 million in losses, which according to the defense failed not *because it was a Ponzi scheme*, but because Rivernider bumped his head ten years before and thus didn't appreciate the risk of the investments he was making.

Rivernider's current tale would make interesting reading but for the lives he has devastated and the facts that undercut his present spin—testimony of coconspirators like Tosha Wade, as well as Rivernider's own email traffic that showed him using his own real estate experience to orchestrate the 104 property flipping scheme, including knowingly jamming investors into multiple properties to secure him large "marketing fees," talking buyers into buying properties they could not unquestionably afford, working with coconspirators such as Shellie Kemp to falsify income as needed, stacking properties, inflating appraisals so he could pull out marketing fees far in excess of the sellers' true sale prices, and misleading lenders into thinking borrowers were putting earnest money and otherwise had skin in the game.

Moreover, as to the ["]No More Bills["] Ponzi scheme, the timeline makes clear that Rivernider knew before he took the present victim investors' monies he was making lottery bets on what he likely knew were themselves Ponzi schemes, perhaps expecting he would be able to cash in before the house of cards collapsed. As [a] fitting conclusion to the sordid tale, the very picture painted by [Rivernider's] mental health "expert" is itself false, misleading[,] and based on an erroneous interpretation of relevant data . . . . In the end, [] Rivernider's conduct in 2006 through early 2008 was not an isolated event, but [rather a] carefully orchestrated multi-month scheme[] involving many victims. . . . The impact of [Rivernider's] brazen fraud on real victims[,] and his willingness to play roulette with their financial and family lives illustrate[s] the exact reason a significant sentence is required in this case.

(Exhibit "B") (Government's sentencing memorandum) (internal footnote excluded) (emphasis in original).

At the sentencing hearing, the district court declined to give Rivernider a reduction for acceptance of responsibility despite his plea of guilty, stating, "As I sit here at this moment

listening to your statement ringing in my ears, I can't find that you have accepted responsibility. Your pro se motions undercut any claim that you might have for a reduction" (Exhibit "C" at 199) (Sentencing Transcript). The district court continued:

> In your pro se submission you asked me to dismiss the indictment, permit you to withdraw your guilty pleas and give you a new trial based on egregious prosecutorial misconduct, ineffective assistance of counsel and the failure of the system to provide you with a fair chance at trial. Nowhere in that extensive submission is there any recognition of or acceptance of responsibility of your criminal conduct.
>
> So on this record there is no way I can find that you have clearly demonstrated acceptance of responsibility within the meaning of Guideline Section 3E1.1, and I make that decision having listened very carefully to your statements today here in open court.
>
> .  .  .
>
> For whatever reason, Mr. Rivernider, you remain defiant. In your motion for relief from your guilty pleas, you point the finger at everybody else. You accuse these people seated across from you of egregious prosecutorial misconduct and you accuse Agent West of committing perjury in the grand jury. You assert that Tosha Wade committed perjury. You present yourself as a victim of misconduct of the most serious kind. You suggest that the government was tapping your phone, viewing your emails. You don't offer any indication that you have looked within, that you have gauged the consequences of your reckless criminal behavior. So even though you're a first offender, I'm concerned that there is a continuing risk of reoffense.
>
> I will tell you, Mr. Rivernider, that I've had fraud cases where the offense conduct was pretty egregious but by the time of sentencing, the defendant was sincerely remorseful. I've had cases where the defendant presented himself at sentencing with humility, with a desire to forthrightly acknowledge his wrongdoing and with a sincere desire to make amends. You come here with defiance accusing other people of wrongdoing, and it's a concern.

*Id.* at 199-200, 215-216).

On December 18, 2013, the district court varied downward, ultimately sentencing Rivernider to 144 months of imprisonment, followed by five years of supervised release, and a surrender date of January 29, 2014 (Exhibit "D") (J&C).

4

On March 28, 2024, upon his release from prison, Rivernider's supervision was transferred to the Middle District of Florida (Exhibit "E") (Transfer of Supervision). Less than 3 months later, Rivernider began his barrage of motions, starting with his demand that his "unconstitutional sentencing order imposed by the sentencing court" be "expunge[d]" and requesting "restitution" for "the violation of civil rights" and "to hold the sentencing court and its officers accountable for their actions and serve as a deterrent against future violations" (Exhibit "F" at 13-14) (Petition Challenging the Violation of Constitutional Rights). The geneses for these damages—Rivernider alleged—was the "imposition of both supervised release and imprisonment for the same offense" resulting in a violation of "the Double Jeopardy Clause." *Id.* at 2. The district court in the Middle District of Florida denied Rivernider's petition, stating in an endorsed paperless order that "[a] sentence imposing a term of supervised release following incarceration does not violate double jeopardy" (Exhibit "G" at DE 9) (MDFL Docket).

Undeterred, Rivernider continued to file frivolous motions until his arrest on June 25, 2025. *Id.* at DE 14.[4] His arrest was due to his commission of multiple violations of his supervised release, including, but not limited to, failure to report, failure to disclose financial information, and obtaining a Nex Credit/Loan without approval. *See* (Exhibit "H") (Judgment of Revocation). On December 12, 2025, the district court in the Middle District of Florida sentenced Rivernider to 3 years' imprisonment with no supervision to follow. *Id.*

---

[4] Rivernider's arrest didn't stop him from continuing his onslaught of motions. In fact, his abuse became so profuse that the district court in the Middle District of Florida entered the following order: "In light of the prolific and voluminous filing of motions, appeals, and other documents by Defendant Robert Rivernider, the Government's obligation to respond to pending motions and appeals is suspended. Should a response be appropriate, the Court will direct the Government to file a response. . . ." (Exhibit "G" DE 93).

While in temporary holdover status in the Southern District of Florida at FDC Miami, Rivernider filed his Second Amended Petition. *See* (Exhibit "I") (Declaration of Aubrey Webb at ¶ 2). Subsequently, BOP transferred him to FCI Beckley, West Virginia. *Id.* His current projected release date is January 14, 2028. *See* www.bop.gov/inmateloc/. [5]

## II.      EXHAUSTION—A NECESSARY STEP PETITIONER IGNORED

BOP has established an Administrative Remedy Program, codified at 28 C.F.R. §§ 542.10–542.18, whereby inmates can seek formal review of any complaint regarding any aspect of their imprisonment. *See* 28 C.F.R. § 542, Subpart B. In accordance with the Bureau's Administrative Remedy Program, an inmate shall first attempt informal resolution of a complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. *See* 28 C.F.R. § 542.13(a). If the complaint cannot be resolved informally, the inmate may submit a formal written Administrative Remedy Request to the Warden, on a designated form, within twenty days of the event that triggered the inmate's complaint. 28 C.F.R. § 542.14(a). Administrative Remedy Form BP-229(13) is the form to be utilized at the institution level, which is commonly referred to as a "BP-9" form. *Id.*

If the inmate is not satisfied with the response to the BP-9 received from the Warden, the response may be appealed to the Regional Director within 20 days of when the warden

---

[5] Notably, the issue of whether an inmate's post-filing transfer to another jurisdiction affects the court's jurisdiction where he filed is not settled law in the Eleventh Circuit. *Williams v. Warden*, 786 F.Supp.3d 436, 446 (D.N.H. 2025) (Recognizing that the 1st and 11th Circuits as the only circuits where it remains unclear if an inmate's post-filing transfer to another jurisdiction strips the original court's jurisdiction but noting "both [the 1st and the 11th] have suggested they would join the consensus [of the other Circuits] . . . The basis for these diverging approaches primarily stems from competing interpretations of the Supreme Court's opinions in *Ex parte Endo*, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944), and *Padilla*, 542 U.S. at 426, 124 S.Ct. 2711").

signed the response. 28 C.F.R. § 542.15(a). Administrative Remedy Form BP-230(13) is the form to be utilized at the regional level, which is commonly referred to as a "BP-10" form. 28 C.F.R. §542.15. If the inmate is not satisfied with the response of the Regional Director, that response may be appealed to the General Counsel's Office within 30 days of when the Regional Director signed the response. *Id.* Appeal to BOP's Office of General Counsel is the final step in BOP's administrative remedy process. *Id.* Administrative Remedy Form BP-231(13) is the form to be utilized at the final level, which is commonly referred to as a "BP-11" form. *Id.* at (b)(1) If the inmate does not receive a response within the time allotted for reply, including an extension, the inmate may consider the absence of a response to be a denial at that level. 28 C.F.R. § 542.18. No administrative remedy appeal is considered to have been fully exhausted until considered by the Bureau of Prisons's Central Office. 28 C.F.R. §§ 542.14-542.15.

Additionally, the exhaustion requirement must also be "proper," meaning a federal prisoner must comply with BOP's administrative remedy procedures. *See Woodford v. Ngo*, 548 U.S. 81 (2006); *see also Flores v. Lappin,* 580 F. App'x 248, 249 (5th Cir. 2014). Prisoners are required to exhaust administrative remedies prior to seeking habeas relief, pursuant to § 2241. *See Santiago-Lugo v. Warden*, 785 F.3d 467, 471-75 (11th Cir. 2015) (while exhaustion is not a jurisdictional prerequisite, petitioners seeking habeas relief under § 2241 are still required to exhaust, and failure to exhaust administrative remedies remains an affirmative defense that a court cannot skip over to grant habeas relief); *United States v. Flanagan,* 868 F.2d 1544, 1546 (11th Cir. 1989) ("[A] federal prisoner dissatisfied with the computation of his sentence must pursue the administrative remedy available through the federal prison system before seeking judicial review of his sentence.").

The exhaustion of administrative remedies is an integral part of BOP's internal system of governance of inmates. If BOP has erred in its handling of Rivernider's sentence, it should be afforded the opportunity to rectify the error. *See Smith v. Thompson*, 937 F.2d 217, 219 (5th Cir. 1991) (agency should be given an opportunity to correct its own errors, and, at a minimum, develop a record for the court, before a party seeks judicial intervention).

Rivernider failed to file any administrative remedy, despite his clear ability to do so. (Exhibit "I" at ¶ 3). Instead, Rivernider intentionally leapfrogged his petition straight to this Court for resolution in violation of BOP's regulations. The warden has 20 days to respond to an inmate's administrative remedy request. *Id.* Rivernider was at FDC Miami for over 30 days. *Id.* His justification that it would take too long or would be futile to exhaust his administrative remedies rests on the assumption that his claims have merit—which they do not. *See Gerholdt v. Orr*, 624 Fed. Appx. 799, 802-803 (3d Cir. 2015) (rejecting defendant-inmate's futility argument where inmate assumed using the grievance process would be futile).

Rivernider filed his initial petition on February 26, 2026 and his Second Amended Petition on March 20, 2026, according to his certificates of service (DE 1, 6). In his first petition, he claimed exhaustion was futile because he had yet to be designated to a federal facility (DE 1). Yet, a week later, he arrived at FDC Miami. *See* (Exhibit "I" at ¶ 3). There was no impediment—and Rivernider alleges none—to filing his administrative remedy with BOP upon his arrival at FDC Miami. To be sure, Rivernider wholly fails to address his obligation to exhaust in his Second Amended Petition. *See* (DE 6). His silence speaks volumes.

Moreover, in the Eleventh Circuit, whether the futility exception is even available for § 2241 petitions is still unsettled law. *Cros-Toure v. Neely,* 2024 WL 2178618, at *2 (N.D. Ala.

Mar. 4, 2024), R. & R. adopted, 2024 WL 2163851 (N.D. Ala. May 14, 2024). At a minimum though, courts in this Circuit have held that even if a futility exception does exist, it would only apply "[i]n extraordinary circumstances." *Gomez-Feliz v. Jenkins*, 2024 WL 5700925, at *2 (N.D. Ga. Dec. 16, 2024) (citing *Jaimes v. United States*, 168 Fed. Appx. 356, 359 (11th Cir. 2006). Rivernider has not demonstrated any circumstances for his failure to exhaust, much less of the "extraordinary" variety. Therefore, he has failed to exhaust his administrative remedies, and the Court must deny his petition.

### III.   ARGUMENT

#### A.   Grounds 1 through 5 are improperly brought pursuant to 28 U.S.C. § 2241

Rivernider's grounds 1 through 5 are not cognizable in his 28 U.S.C. § 2241 petition. Each ground involves—in some form or another—the constitutionality of his revocation judgment entered by the district court in the Middle District of Florida. Such claims are an attack on his actual sentence, which would be properly brought either by way of a direct appeal or potentially a Section 2255 motion before the district court that imposed his sentence. Simply put, the Court lacks jurisdiction to decide these claims. *See, e.g., Andrews v. Warden, FPC Talladega,* 2019 WL 8499407, at *3-4 (N.D. Ala. Nov. 8, 2019) (holding there was no subject matter jurisdiction in § 2241 petition where inmate only attacked the underlying conviction and sentence, rather than execution of his sentence by BOP). Therefore, the Court should summarily dismiss grounds 1 through 5.[6]

#### B.   Grounds 6 through 10 are meritless.

In grounds 6 through 10, Rivernider argues essentially that BOP improperly computed his sentence by failing to "[p]roperly credit Petitioner for prior custody, including

---

[6] Even if properly brought here, grounds 1 through 5 are patently frivolous.

approximately 80 months previously served; incorrectly "calculate good time credit;" and "[p]roperly account for Petitioner's eligibility for home confinement" (DE6-1:2). Contrary to Rivernider's assertions, BOP properly computed Rivernider's revocation sentence.

The district court in the Middle District of Florida revoked Rivernider's supervision and sentenced him to 3 years of incarceration with no supervision to follow. Rivernider continues to unsuccessfully fight this fight—that his revocation sentence is somehow unlawful—first in the Middle District of Florida and now here.

A revocation sentence is a new sentence, which is separate and distinct from an inmate's original sentence. 28 C.F.R. § 2.35(b) ("Once an offender is conditionally released from imprisonment, either by parole or mandatory release, the good time earned during that period of imprisonment is of no further effect either to shorten the period of supervision or to shorten the period of imprisonment which the offender may be required to serve for violation of parole or mandatory release."); *Wallace v. Williams*, 2022 WL 6580326, at *2 (S.D. Ill. Sep. 27, 2022) ("[M]ultiple district courts . . . have found that revocation sentences are separate and distinct from the original underlying sentence for purposes of calculating GCT and concluded that a prisoner serving a post-revocation sentence is not entitled under the First Step Act to additional GCT for time served on the original underlying sentence."). Thus, Rivernider's claims regarding prior jail credit and future good time credit are without merit. Specifically, his current sentence computation is as follows: BOP awarded Rivernider 170 days of prior jail credit (from June 25, 2025 through December 11, 2025) toward his revocation sentence (Exhibit "I," at ¶ 12). His federal sentence commenced on December 12, 2025, the day he was sentenced. *Id.* He is projected to earn 162 days of good time credits assuming there are no disciplinary violations. *Id.*

To the extent Rivernider is claiming he should receive prior credit or good time credit from his prior incarceration, as stated above, a revocation sentence is a new sentence and any prior credits ended when Rivernider was released from prison. *See Wallace*, 2022 WL 6580326, at *2. Additionally, Rivernider's bare assertion that he is somehow entitled to use 80 months from his prior sentence toward his current revocation term is frivolous and unsupported.

Since BOP considers a revocation sentence a new sentence, it also considers earned time credits the same as good credit time in that they do not carry over to a future revocation sentence. *Miller v. United States*, 2023 WL 5651847, at *1 (W.D. Wis. Aug. 31, 2023) ("BOP may not apply unused FSA time credits from his previous term of incarceration to his current term of incarceration."); *see White v. Sproul,* 2021 WL 1854642, at *2 (S.D. Ill. May 10, 2021) ("[A]n inmate who is serving a revocation term is only entitled to additional good credit time on the revocation term and not on the underlying sentence that had already been satisfied"); *see also Jamison v. Warden, Elkton Federal Correctional Institution*, 2019 WL 5690710 (S.D. Ohio, Nov. 4, 2019) (rejecting claim for GCT on original sentence because "the imprisonment that ensues from revocation is partly based on new conduct, is wholly derived from a different source, and has different objectives altogether; it is therefore a different beast."). Consequently, Rivernider can't use any unused time credits or good time credits from his prior incarceration. *See id.*

Additionally, Rivernider's claim that he is entitled to FSA time credits due to BOP's alleged "delay" in his designation is equally unfounded. Rivernider essentially argues he is entitled to FSA credits from the time he was in county jail from December 12, 2025, when the district court in the Middle District of Florida sentenced him on the revocation, until March 5, 2026, when he was brought to FDC Miami. But an inmate can't earn FSA time credits when

11

he is in the custody of non-federal agencies or when he is in federal custody but being transferred to his designated institution. 28 C.F.R. § 523.41(c)(4); *see* 18 U.S.C. § 3632(d)(4)(A); *see, e.g., Sharma v. Peters,* 756 F.Supp.3d 1271, 1282 (N.D. Ala. 2024).

Similarly, Rivernider vaguely claims—without offering any evidence—that he has nine (9) months of qualifying programming, which has not yet been applied to his sentence. He appears to be referring to the period from his initial arrest for violations of his supervision on June 25, 2025, until he arrived at FDC Miami in March 2026. However, as stated above, he only began earning time credits upon arrival at FDC Miami. 28 C.F.R. § 523.41(c)(4); *see* 18 U.S.C. § 3632(d)(4)(A).

Finally, regarding Rivernider's request to be placed in home confinement, Supreme Court precedent dictates that the placement of federal inmates serving a lawfully imposed sentence is within the sole discretion of the BOP. *See McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.") citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976). Likewise, federal statutes provide BOP "unfettered authority to decide where to house federal prisoners" and preclude "any approach that puts the juridical branch in charge of designating the place of confinement for a federal prisoner—no matter how well justified on utilitarian grounds." *In re Gee*, 815 F.2d 41, 42 (7th Cir. 1987); 18 U.S.C.A. § 3624(c); 42 U.S.C.A. 17501.

Furthermore, under the FSA, the determination of whether and how long to place an inmate in prerelease custody is a discretionary, non-reviewable determination. *See* 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.") *Mingo v. Bragg*, 2020 WL 8371203, at *2 (D.S.C. July 28, 2020) ("The First Step Act did not alter the BOP's statutory authority to

12

determine when, or if, [an inmate] is placed in an RRC or on home confinement."); *Brown v. Underwood*, 2019 WL 5580106 (N.D. Tex 2019) ("The decision whether – and, if so, for how long – to place an inmate in a residential reentry center ("RRC") – a halfway house – is committed to the BOP under statutory authority"); *Meade v. Maiorana*, 2015 WL 1731274, at *2-*3 (W.D. La. Apr. 14, 2015) (finding that Section 3624(c) "does not automatically entitle an inmate to placement in an [residential reentry center] . . .." (citation omitted). Accordingly, Rivernider's request for home confinement must be denied as the Court lacks the authority to order it.[7]

## IV.    CONCLUSION

Rivernider's petition should be denied because of his failure to exhaust his administrative remedies. Moreover, his claims that his incarceration is excessive and unlawful are without merit. BOP has correctly computed Rivernider's revocation sentence. Accordingly, his petition should be summarily denied.

Respectfully submitted,

JASON REDDING QUIÑONES
UNITED STATES ATTORNEY

By: s/ *Alicia E. Shick*
Assistant United States Attorney
Florida Bar No. 124842
U.S. Attorney's Office
500 East Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394
Telephone: 954-660-5793
Email: Alicia.Shick@usdoj.gov

---

[7] Although Rivernider's sentence computation states he is ineligible for FSA time credits, BOP has confirmed with Rivernider's Unit Team at FCI Beckley that he is indeed eligible to earn FSA time credits towards prerelease custody. Rivernider began earning FSA time credit when he arrived at FCI Beckley, his designated facility, on April 15, 2026. 18 U.S.C. § 3632(d)(4)(B); 28 C.F.R. § Currently, BOP projects he will be eligible for home detention on September 28, 2027. *See* (Exhibit "I," at ¶ ¶ 10-13).

13

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on May 13, 2026, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF and mailed to:

Robert Rivernider
Reg No. 96006-004
FCI Beckley
Federal Correctional Institution
P.O. Box 350
Beaver, WV 25813


By:   <u>s/ *Alicia E. Shick*</u>
       Alicia E. Shick
       Assistant United States Attorney